IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs July 25, 2017 at Knoxville

## DEMARCUS JONES v. STATE OF TENNESSEE

### Appeal from the Criminal Court for Shelby County
### Nos. 14-02150, 14-02151  J. Robert Carter, Jr., Judge

_____

### No. W2017-00303-CCA-R3-PC
_____

The Petitioner, Demarcus Jones, appeals the Shelby County Criminal Court's denial of his petition for post-conviction relief from his 2015 guilty pleas in case number 14-02150 to especially aggravated robbery, attempted first degree murder, employing a firearm during the commission of a dangerous felony, aggravated burglary, theft of property, and setting fire to property and in case number 14-02151 to especially aggravated robbery, attempted first degree murder, and employment of a firearm during the commission of a dangerous felony, and his effective forty-year sentence. The Petitioner contends that he received the ineffective assistance of counsel and that his guilty pleas were unknowingly and involuntarily entered. We affirm the judgment of the post-conviction court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which ALAN E. GLENN and J. ROSS DYER, JJ., joined.

Robert Golder (on appeal) and Ruchee Patel (at hearing), Memphis, Tennessee, for the appellant, Demarcus Jones.

Herbert H. Slatery III, Attorney General and Reporter; Caitlin Smith, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Carrie Bush, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

        The record does not contain the indictment, the petition to accept the Petitioner's guilty pleas, or the judgments in case number 14-02150. We glean from the guilty plea hearing transcript that the Petitioner was indicted for especially aggravated robbery,

especially aggravated kidnapping, kidnapping, attempt to commit first degree murder, employing a firearm during the commission of a dangerous felony, aggravated burglary, theft of property valued at $1000 or more, and setting fire to property. The indictment in case number 14-02151 reflects that the Petitioner was indicted for especially aggravated robbery, attempted first degree murder, and employing a firearm during the commission of a dangerous felony.

On September 24, 2015, the Petitioner pleaded guilty in case number 14-02150 to especially aggravated robbery, especially aggravated kidnapping, attempted first degree murder, employing a firearm during the commission of a dangerous felony, burglary, theft of property valued at $1000 or more, and setting fire to property. He received an effective forty-year sentence at 100% service pursuant to the plea agreement. The Petitioner pleaded guilty in case number 14-02151 to especially aggravated robbery, attempted first degree murder, and employing a firearm during the commission of a dangerous felony, and he received an effective forty-year sentence. The effective sentences in both case numbers were imposed concurrently, for an overall effective forty-year sentence.

On September 13, 2016, the Petitioner filed a petition for post-conviction relief, alleging that his guilty pleas were not knowingly and voluntarily entered, that his convictions were based upon a coerced confession, and that the State failed to disclose favorable evidence. The Petitioner also alleged that he received ineffective assistance by counsel's failure to investigate the Petitioner's mental health, failure to explain the charges and the possible sentences if convicted after a trial, advising the Petitioner to plead guilty because he would be convicted at a trial and would be ordered to serve consecutive sentences, failing to investigate his case or to formulate a defense, and failing to review the guilty plea forms before the guilty plea hearing.

**Guilty Plea Proceedings**

According to the State's recitation of the facts in case number 14-02150,

on June 21, 2013, Devin Champion was with Mr. Jones and [a codefendant] when [the codefendant] shot Mr. Champion and then Mr. Jones also shot Mr. Champion. They put him in the trunk and took him to another location and Mr. Jones shot him again, leaving [Mr. Champion] for dead.

They were in a stolen car . . . that the three of them had stolen earlier that day with the property of the victim's in that car as well. They took certain items from Mr. Champion after they shot him in the field and put him in the trunk and took him to another field. They set fire to the vehicle that they had stolen earlier that day . . . .

-2-

According to the State's recitation of the facts in case number 14-02151,

> on June 6, 2013, the victim . . . was called to deliver pizza . . . . There he
> encountered [a codefendant] . . . as well as Mr. Jones. [The codefendant] and
> Mr. Jones robbed the victim Mr. Levy, and Mr. Jones shot him one time in the
> stomach.

The Petitioner stipulated to the factual basis for the guilty pleas, and counsel stated that the Petitioner was pleading guilty as a Range II offender to "avoid the possibility of the time." During the colloquy with the trial court, the Petitioner stated that he had signed the petition for waiver of a trial and request for acceptance of his guilty pleas and that he had reviewed the documents with counsel. The Petitioner stated that he understood he had the right to plead not guilty and to proceed to a trial, to cross-examine the State's witnesses, to present defense witnesses, and to testify on his own behalf. He said he understood that it was his decision whether to testify at a trial and that he had the right to appeal a conviction after a trial. He understood that by pleading guilty he was giving up those rights and that he wanted the court to find him guilty without a jury based upon the plea agreement. The Petitioner said that he had told counsel everything he knew about the cases and that they had discussed the cases at court appearances, reviewed the discovery materials, and discussed possible defenses.

The trial court explained that, in case number 14-02150, the Petitioner was pleading guilty as a Range II offender to especially aggravated robbery and especially aggravated kidnapping and that he would receive a forty-year sentence at 100% service. The court explained that the Petitioner was pleading guilty as a Range I, standard offender to attempted first degree murder, which carried a possible sentence of fifteen to sixty years, and that the Petitioner would receive twenty-five years at 30% service. The court explained that the Petitioner would receive a six-year sentence at 100% service for employing a firearm during the commission of a dangerous felony, to be served consecutively to the twenty-five years but concurrently with the with the forty-year sentence. The court explained that the Petitioner would receive Range I sentences of six years for theft and four years for setting fire to property, all to be served concurrently with the forty-year sentence. The Petitioner agreed that those were the terms of the plea agreement and that he would receive an effective forty-year sentence at 100% service. The Petitioner understood that if he were convicted of the charged offenses at a trial and ordered to serve consecutive sentences, he would receive "a significantly higher" effective sentence.

The trial court explained that, in case number 14-02151, the Petitioner was pleading guilty as a Range II offender to especially aggravated robbery and would receive an effective forty-year sentence. The court explained that the Petitioner was also pleading guilty to

attempted first degree murder and employing a firearm during the commission of a dangerous felony and would receive twenty-five and ten years, respectively, for an effective forty-year sentence. The Petitioner stated that he understood the sentences and that the effective forty-year sentences in each case would be served concurrently. The Petitioner agreed his overall effective sentence was forty years at 100% service.

The Petitioner stated that he was entering his guilty pleas freely and voluntarily, that nobody had threatened or forced him to plead guilty, and that he had fully discussed the terms of the agreement with counsel. The Petitioner denied taking medication he was not prescribed and confirmed he took his prescribed medication on the morning of the guilty plea hearing. The Petitioner said he was "clear-headed" and understood the proceedings. The trial court asked whether the Petitioner had any questions, and the Petitioner requested confinement in an Arkansas prison. The court explained that he did not know whether the Petitioner could be transferred to an Arkansas prison because he was being ordered to serve his sentence in the Tennessee Department of Correction (TDOC). The court explained that any decision about transferring the Petitioner would be made by the TDOC. The Petitioner said he understood and told the court that the location of his confinement did not impact his decision to plead guilty.

The trial court denied the Petitioner's request that his father be permitted to address the court. The court inquired whether the Petitioner had previously discussed the plea agreement with his father, and the Petitioner said he had. The court told the Petitioner that it was important to discuss a plea offer with the Petitioner's family, and the Petitioner stated he understood it was his decision whether to plead guilty. The Petitioner stated that he made the decision to plead guilty. The Petitioner did not have additional questions for the court and said he understood that his pleading guilty was "the end of the case" and that the court would impose the agreed-upon sentences.

The trial court found that the Petitioner entered his guilty pleas freely and voluntarily and waived the relevant rights knowingly and intelligently. The court determined that the Petitioner entered his guilty pleas without threats or coercion and in compliance with "the standard of *Baxter* [*v.*] *Rose* for effective assistance of counsel."

## Post-Conviction Proceedings

At the post-conviction hearing, Gregory Jones, the Petitioner's paternal grandmother, testified that the Petitioner had a sixth-grade reading comprehension level. She played an active role in the Petitioner's education, attending conferences with his teachers. She said that his school placed him in an "alternative" program and "just pushed him through" until he left school at age fourteen or fifteen. She said that the Petitioner was diagnosed with "schizophrenia behavior disorder" at age three and with "bipolar depression." She said that

-4-

in 2003, when the Petitioner was age five, the Petitioner's mother took the Petitioner from Ms. Jones's care and that Ms. Jones did not know the Petitioner's whereabouts for seven years. She said that the Petitioner's mother "ha[d] a behavior problem herself," that the Petitioner's mother's home was unstable, and that Ms. Jones did not approve of the men the Petitioner's mother brought into the Petitioner's life.

Upon examination by the post-conviction court, Ms. Jones testified that she and the Petitioner became reacquainted when the Petitioner was age twelve. She said that she was allowed to have contact with him but that he did not live with her.

Demarcus Butler, the Petitioner's father, testified that the Petitioner began living with him at age twelve but returned to the Petitioner's mother's home at age fourteen. Mr. Butler said that the Petitioner was behind in school because of his medication, which caused "a little slower effect than other children." Mr. Butler said that during the time the Petitioner lived with him, he did not give the Petitioner the mental health medications because Mr. Butler thought an active lifestyle and a healthy diet "balance[d] him out opposed to just taking the medications." Mr. Butler said the Petitioner did not take the medications on his own. Mr. Butler said that the Petitioner had difficulty reading and that Ms. Jones worked with the Petitioner more than Mr. Butler.

Mr. Butler testified that he was not permitted to speak at the guilty plea hearing and that he realized he was "out of order" when he stood up at the hearing. Mr. Butler said that based upon his discussions with the Petitioner the previous night, he thought the Petitioner was pleading not guilty and proceeding to a trial. Mr. Butler said that they talked about the details of the case and that the Petitioner thought "he would do better if he went to trial so he could get everything out." Mr. Butler said he told the Petitioner that Mr. Butler supported the decision to plead not guilty. Mr. Butler said that he attended every court date and regularly visited the Petitioner and that the Petitioner never conveyed that he would plead guilty.

On cross-examination, Mr. Butler testified that the Petitioner's mother hired counsel and that counsel spoke to Mr. Butler about the cases at every court date. Mr. Butler thought that he and counsel were communicating about the "pros and cons" of the case. Mr. Butler was not present in juvenile court after the Petitioner was arrested in an unrelated matter for domestic violence, vandalism, and attempted aggravated burglary. Mr. Butler learned of the incident later due to his traveling for work. Mr. Butler talked to the Petitioner about his conduct. Mr. Butler said that he attended the juvenile court transfer hearing related to this case and that the Petitioner underwent a psychological examination before the transfer hearing.

The Petitioner testified that he was age nineteen at the time of the post-conviction hearing and was age sixteen at the time of the offenses. He said he lived with his mother at the time of his arrest but that he previously had lived with Ms. Jones and his father from ages twelve to fourteen. The Petitioner said that he finished the seventh grade before attending an alternative school and that he was dismissed from the tenth grade at the alternative school because of his arrest in these cases. He said that he could not read or write well and that a fellow inmate wrote his post-conviction petition.

The Petitioner testified that he took about five medications twice daily, that he did not know all of the medications, and that he did not always take them as prescribed. He knew he took medication for seizures and attention deficit disorder. He said that he did not always take his medications before his arrest. He said that he was not able to see and hear clearly after a seizure but that he did not have them frequently because of the medication. He said that generally, he could not "think straight," became angry for no reason, and felt as though someone was out to get him. The Petitioner said that before the juvenile court transfer hearing, he was in confinement for four months and took his medications as prescribed most of the time because a nurse provided them. He said he noticed he felt better when he took his medications. He said that after he was transferred to criminal court, he took his medications regularly. He said that although he felt better when he took his medications, he suffered from the side effects, including feeling hot and having a dry mouth.

The Petitioner testified that he only spoke to counsel at court appearances. He said that although he received the discovery materials, counsel did not review them with him. The Petitioner said that he asked counsel why counsel never came to the jail, that counsel said he was going to come to the jail, but that counsel never came. The Petitioner said he had questions about his case that were never answered. He wanted a trial but agreed he did not tell the trial court he wanted a trial. He said that on the day he pleaded guilty, he thought his cases would be scheduled for a trial. The Petitioner said that before the guilty plea hearing, counsel provided him with a document, told him to sign it, and told him the sentence would be twenty years. The Petitioner said that the document said forty years, that he asked counsel about it, and that counsel said "that's how it just looks on the paper." The Petitioner said that he signed the document thinking he would receive a twenty-year sentence, that counsel only said the trial judge would ask questions to ensure nobody forced the Petitioner to plead guilty, and that the Petitioner simply answered the judge's questions with yes or no responses. The Petitioner said he did not understand the judge's questions and did not ask questions because he feared being found in contempt of court.

The Petitioner testified that he spoke to his father the night before he entered his guilty pleas, that he told his father that he was "going to try to go to trial," and that he was not "thinking straight" or in the "right state of mind" the next day when he pleaded guilty. He thought he received "a good deal" but said he "was just trying to hurry up and get out

because it seemed like [he] was in a lose-lose situation." He did not think he would serve twenty years and said that although he said he understood at the guilty plea hearing, he did not understand what "a guilty plea means." He said that he did not understand he could not appeal his convictions and that he had assistance preparing his initial post-conviction petition. The Petitioner stated that he understood the charges would be reinstated if the court granted post-conviction relief and that he understood the possible sentences.

On cross-examination, the Petitioner testified that at the guilty plea hearing, he told the trial court that he understood he was waiving his rights by pleading guilty and that counsel had done what the Petitioner had asked of counsel. He agreed he told the trial court that he took medication, which did not affect his judgment. He said he did not know the possible sentences he might receive after a trial but did not dispute the prosecutor's stating the possible effective sentence was 100 to 150 years. The Petitioner said he understood consecutive sentencing and that his "inmate counselor" mentioned that the Petitioner could receive consecutive sentences after a trial.

The Petitioner testified that he and counsel did not discuss possible defenses and that counsel merely told him to read the discovery materials, although counsel knew he could not read. He agreed he told the trial court that he was entering his guilty pleas freely and voluntarily. When asked why he signed the plea agreement form, the Petitioner said he was not thinking and did not know what he was signing. He did not recall asking the trial court to serve his sentence in an Arkansas prison but recalled telling the judge that he and counsel had discussed his case fully.

The Petitioner testified that he wanted counsel to investigate names in order to assist with the defense but that counsel never asked for the names. He said that he wanted counsel to investigate "Ron, Kaylon, Terron, Kaylin . . . , and Quentin" but that he did not provide those names to post-conviction counsel.

Upon examination by the post-conviction court, the Petitioner testified that he told counsel everything he knew about his cases when they met. He said he heard the testimony at the juvenile court transfer hearing and knew the accusations against him.

Juvenile Court Magistrate Judge Raymond Lepone testified that he negotiated the Petitioner's plea agreement as a former assistant district attorney general. He said that when the Petitioner's cases were in juvenile court, a psychological examination was conducted. Judge Lepone said that the defense did not raise any concerns that the Petitioner had seizure, bipolar, or developmental disorders. Judge Lepone did not recall whether the Petitioner's inability to read and write was raised in the juvenile or trial court proceedings and noted that many times, juveniles in the criminal justice system had learning disabilities.

Judge Lepone testified that he thought the maximum possible sentence the Petitioner faced was about 120 years. Judge Lepone said that he provided an open-file discovery process to counsel, that he and counsel met several times after counsel reviewed the discovery, and that counsel inquired whether the Petitioner could testify against his codefendant. Judge Lepone recalled that the Petitioner was the alleged shooter, which prevented the need for the Petitioner's testimony. Judge Lepone said that counsel's focus, based upon the overwhelming evidence of the Petitioner's guilt, was to reduce the amount of time the Petitioner would serve. Judge Lepone said that he knew the Petitioner was going to plead guilty at the scheduled hearing date because he and counsel reached an agreement and that Judge Lepone asked another assistant district attorney to handle the guilty plea hearing.

On cross-examination, Judge Lepone testified that it was not possible the Petitioner first learned of the plea agreement on the day of the guilty plea hearing. Judge Lepone said that counsel talked to him many times after speaking with the Petitioner and that on these occasions, counsel continued to negotiate. Judge Lepone recalled that the Petitioner's father "had a problem absorbing the amount of time" the Petitioner would serve. Judge Lepone agreed that he offered fifty years initially and that the ultimate agreement was forty years.

On redirect examination, Judge Lepone testified that the codefendant received thirty-five years at 100% service. Judge Lepone recalled that in case number 14-02150, the victim, who survived gunshot wounds to the head and body, was placed inside a car's trunk and that the victim heard the Petitioner and his codefendant discussing burning the victim alive while inside the trunk and how to dispose of the victim's body. Judge Lepone said that the victim identified the Petitioner as the person with the "most active role in pulling the trigger and the discussions on what to do" with the victim. Judge Lepone said that the Petitioner admitted to the police to shooting the victim in case number 14-02151 involving the pizza delivery person.

Counsel testified that he had been a criminal defense attorney for fifteen years and that he represented the Petitioner after the juvenile court transfer hearing. He said he received and reviewed the juvenile court mental evaluation report and discussed the Petitioner's mental stability and general childhood with the Petitioner's mother. Counsel said he met with the Petitioner at the jail and at the courthouse and recalled another attorney meeting with the Petitioner. Counsel said that the case involved extensive negotiations with the prosecutor and that he negotiated an effective forty-year sentence from fifty years. He said that the document he presented to the Petitioner about the plea offer included a calculation of the amount of time the Petitioner faced if convicted after a trial and that the Petitioner faced more than 100 years in confinement. Counsel said that he showed the Petitioner the original fifty-year plea offer and that the Petitioner considered accepting it because of the potential 100-year sentence after a trial. Counsel recalled that after the prosecutor agreed to forty years, the Petitioner's mother wanted forty years' probation and

-8-

that he explained to her and to the Petitioner's father that the Petitioner was not eligible for probation. Counsel said his focus was to save the Petitioner's life because the victim's testimony of his being placed inside the trunk of the car would have been damaging at a trial. Counsel recalled the victim's preliminary hearing testimony that the victim was shot fifteen to eighteen times, heard the Petitioner and the codefendant discuss setting the car on fire and how to dispose of the victim's body, and saw the Petitioner holding a lighter. Counsel said that he attempted to reach a plea agreement that would allow the Petitioner to experience life outside of jail and that the Petitioner might have obtained release in his early fifties with good-time credit.

Counsel testified that he asked the Petitioner for information helpful to the defense and met with the Petitioner's mother multiple times at counsel's office. Counsel said this was a difficult case and offered the Petitioner's testimony to the prosecutor in exchange for less prison time. Counsel noted, though, the State's proof showed the Petitioner was the shooter in both cases. Counsel said that he and the Petitioner reviewed the plea agreement documents multiple times. Counsel recalled discussing the plea offer with the Petitioner's father and mother and providing the discovery materials to the Petitioner's mother. Counsel said that the Petitioner's mother mentioned a mental health evaluation. Counsel said that he had the report from the evaluation conducted in juvenile court and that counsel could not raise any of those issues at a guilty plea hearing. Counsel said that he explained mental health issues were helpful to mitigation at a sentencing hearing but that "why would we want to risk [The Petitioner's] getting a one hundred plus years in prison when we could try to save his life."

On cross-examination, counsel testified that he did not recall whether the Petitioner's mother paid for an investigator. Counsel said that neither the Petitioner nor his mother provided counsel with names of people to speak with or to investigate. Counsel said that he thought the Petitioner could read because the Petitioner's mother discussed the Petitioner's being a good student with a 3.6 grade point average and provided counsel with the Petitioner's report cards. Counsel knew the Petitioner had attended an alternative school and said the information provided to him showed the Petitioner was doing well and making good grades.

Counsel testified that he and the Petitioner reviewed "everything" relevant to his cases on multiple occasions and that the Petitioner knew the possible outcomes and decided to plead guilty after speaking with his family and realizing the plea agreement was in the Petitioner's best interest. Counsel said the Petitioner was adamant that he did not want a trial, and counsel explained to the Petitioner and his mother that the Petitioner would not receive probation. Counsel said he explained to the Petitioner that his good behavior in confinement could possibly earn him a 15% sentence reduction but that this determination was at the discretion of the TDOC. Counsel said, though, the Petitioner understood that

without the sentence reduction, the Petitioner would serve 100% of the forty-year sentence. Counsel said the Petitioner wanted to accept the plea offer and forgo a trial.

The post-conviction court denied relief. Relative to the Petitioner's ineffective assistance claims, the court found that the Petitioner failed to show that counsel provided deficient performance and that the Petitioner was prejudiced. The court found that counsel was knowledgeable about the cases and that it was "unclear what [the Petitioner] wanted his attorney to do." The court found that his claim of "mental difficulties" was undermined by the Petitioner's mother's statements to counsel. Relative to the Petitioner's claim that his guilty pleas were involuntary, the court found that the guilty plea hearing transcript showed that the Petitioner was "aware of the nature of the proceedings" and that the Petitioner was asked by the trial court about his medications, his discussions with counsel, and his discussions with his father. The court found that "no credible evidence" showed the Petitioner's guilty pleas were involuntary. This appeal followed.

## I.      Ineffective Assistance of Counsel

The Petitioner contends that counsel was ineffective because counsel failed to communicate properly with him, failed to visit him at the jail, erroneously informed him that the plea agreement was for twenty years, failed to inform him that the sentences were outside the appropriate sentencing range, and failed to inform him that he could not receive more than twenty-five years for any single offense to which he pleaded guilty. The State responds that the Petitioner failed to establish his claims. We agree with the State.

Post-conviction relief is available "when the conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103 (2012). A petitioner has the burden of proving his factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f) (2012). A post-conviction court's findings of fact are binding on appeal, and this court must defer to them "unless the evidence in the record preponderates against those findings." *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997); *see Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's application of law to its factual findings is subject to a de novo standard of review without a presumption of correctness. *Fields*, 40 S.W.3d at 457-58.

To establish a post-conviction claim of the ineffective assistance of counsel in violation of the Sixth Amendment, a petitioner has the burden of proving that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993). The Tennessee Supreme Court has applied the *Strickland* standard to an accused's right to counsel under article I, section 9 of the Tennessee Constitution. *See State v. Melson*, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A petitioner must satisfy both prongs of the *Strickland* test in order to prevail in an ineffective assistance of counsel claim. *Henley*, 960 S.W.2d at 580. "[F]ailure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). To establish the performance prong, a petitioner must show that "the advice given, or the services rendered . . . , are [not] within the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975); *see Strickland*, 466 U.S. at 690. The post-conviction court must determine if these acts or omissions, viewed in light of all of the circumstances, fell "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. A petitioner "is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy by his counsel, and cannot criticize a sound, but unsuccessful, tactical decision." *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994); *see Pylant v. State*, 263 S.W.3d 854, 874 (Tenn. 2008). This deference, however, only applies "if the choices are informed . . . based upon adequate preparation." *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). To establish the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

The record reflects that the prosecutor assigned to the Petitioner's cases negotiated with counsel numerous times after counsel reviewed the discovery materials. The prosecutor recalled that counsel inquired about the Petitioner's testifying against his codefendant, which was unnecessary because the Petitioner was identified as the shooter in two cases, in an effort to reduce the Petitioner's length of incarceration. Counsel's primary focus in the plea negotiation process, based upon the overwhelming evidence of the Petitioner's guilt, was to minimize the length of time the Petitioner would serve in confinement. Counsel successfully negotiated a forty-year effective sentence, ten years less than the initial fifty-year plea offer.

Likewise, counsel's credited testimony reflects that he met with the Petitioner multiple times at numerous court appearances and at the jail and discussed the case with the Petitioner's parents. Counsel reviewed the discovery materials with the Petitioner and presented the forty-year plea offer, along with the potential 100-year sentence if the Petitioner were convicted at a trial and consecutive sentences were imposed. Counsel testified that the Petitioner considered accepting the fifty-year plea offer based upon the potential sentence. Counsel communicated with the Petitioner's parents throughout his representation and explained that the Petitioner was not eligible for probation. Counsel said that based upon the surviving victim's testimony at the preliminary hearing in case number 14-02150, the victim's testimony at a trial would have been extremely damaging because of the horrendous nature of the offenses.

Neither the Petitioner nor the Petitioner's family provided names of favorable defense witnesses who might rebut the State's evidence. Although counsel was aware of the Petitioner's mental health evaluation report from juvenile court and discussed the Petitioner's mental health issues with the Petitioner's mother, those issues were relevant as mitigation evidence at a sentencing hearing, not a trial or a guilty plea hearing. Counsel's focus was to reach a plea agreement that would reduce the amount of incarceration and that would provide the Petitioner the possibility of experiencing life outside of confinement. Counsel and the Petitioner reviewed all of the evidence on multiple occasions, and although the Petitioner testified he could not read well, the Petitioner's mother told counsel that the Petitioner had a 3.6 grade point average and was a good student at the alternative school program he attended.

No evidence presented at the post-conviction hearing reflects that counsel knew or had reason to suspect the Petitioner was illiterate or had difficulty understanding the discovery materials. Counsel believed the Petitioner understood both the possible outcomes if he were convicted after a trial and the terms of the plea agreement. Counsel explained that without any sentence reduction credits, the Petitioner would serve 100% of the forty-year sentence. Counsel said the Petitioner was adamant that he did not want a trial. We note that the colloquy at the guilty plea hearing reflects that the trial court reviewed the terms of the plea agreement resolving both cases and explained the Petitioner was pleading guilty in case number 14-02150 as a Range II offender to especially aggravated robbery and especially aggravated kidnapping and as a Range I offender to attempted first degree murder. The court also explained that the Petitioner was pleading guilty in case number 14-02151 as a Range II offender to especially aggravated robbery and as a Range I offender to attempted first degree murder. The Petitioner told the trial court that he understood those terms. The record does not preponderate against the post-conviction court's determinations that the Petitioner failed to establish by clear and convincing evidence that counsel provided deficient performance and the Petitioner was prejudiced, and we conclude that the Petitioner is not entitled to relief on this basis.

## II

### Involuntary and Unknowing Guilty Pleas

The Petitioner contends that his guilty pleas were involuntarily and unknowingly entered. He appears to argue that he believed he was going to receive a twenty-year sentence, not a forty-year sentence. The State responds that the Petitioner failed to establish that his guilty pleas were unknowing and involuntary. We agree with the State.

-12-

The Supreme Court has concluded that a guilty plea must represent a "voluntary and intelligent choice among the alternative courses of action open to the defendant." *North Carolina v. Alford*, 400 U.S. 25, 31 (1970). A trial court must examine in detail "the matter with the accused to make sure he has a full understanding of what the plea connotes and of its consequence." *Boykin v. Alabama*, 395 U.S. 238, 243-44 (1969); *see Blankenship v. State*, 858 S.W.2d 897, 904 (Tenn. 1993). Appellate courts examine the totality of circumstances when determining whether a guilty plea was voluntarily and knowingly entered. *State v. Turner*, 919 S.W.2d 346, 353 (Tenn. Crim. App. 1995). A guilty plea is not voluntary if it is the result of "[i]gnorance, incomprehension, coercion, terror, inducements, [or] subtle or blatant threats." *Boykin*, 395 U.S. at 242-43; *see Blankenship*, 858 S.W.2d at 904. A petitioner's representations and statements under oath that his guilty plea is knowing and voluntary create "a formidable barrier in any subsequent collateral proceedings [because] [s]olemn declarations . . . carry a strong presumption of verity." *Blackledge v. Allison*, 431 U.S. 63, 74 (1977).

The record reflects that the Petitioner entered knowing, intelligent, and voluntary guilty pleas. Although the Petitioner testified at the post-conviction hearing that counsel told him the plea agreement was for less than forty years, counsel's credited testimony shows he advised the Petitioner that the offer was forty years, a ten-year reduction from the State's initial plea offer. The record reflects that counsel explained that the Petitioner would serve forty-years at 100% but that the TDOC could reduce that sentence by 15% for good behavior. Relative to the Petitioner's mental capacity, counsel and the Petitioner's mother discussed the Petitioner's performance in school, and she provided counsel with the Petitioner's report cards reflecting a 3.6 grade point average. Counsel reviewed the mental health evaluation from juvenile court, and counsel concluded that it provided mitigation evidence. Counsel had no indication from the Petitioner or the Petitioner's family that the Petitioner was illiterate or had difficulty understanding the proceedings or the terms of the plea agreement.

The petition for waiver of a trial by jury and request for the acceptance of a guilty plea in case number 14-02151 contains the Petitioner's signature and reflects that he would plead guilty to especially aggravated robbery, attempted first degree murder, and employment of a firearm during the commission of a dangerous felony in exchange for sentences of forty, twenty-five, and ten years, respectively. The form was signed by counsel and the prosecutor. The form related to case number 14-02150 is not included in the appellate record.

The guilty plea hearing transcript reflects that the trial court reviewed the charged offenses and their possible sentences. The court reviewed the terms of the plea agreement, and the Petitioner stated that he understood he would receive an overall effective forty-year sentence at 100% service. The Petitioner stated at the hearing that he was pleading guilty

freely and voluntarily and that he had fully discussed the terms of the plea agreement with counsel. The Petitioner stated that he had taken his prescribed medications and that he was "clear-headed" and understood the proceedings. When provided the opportunity to ask questions, the Petitioner asked whether his father could address the court and whether he could serve his sentence in an Arkansas facility. The Petitioner never expressed confusion about the length of his effective sentence and confirmed that he had made the decision to plead guilty. The Petitioner did not express any concern about counsel's competence or inform the court that he thought the plea agreement was for anything other than forty years. We conclude that the record does not preponderate against the post-conviction court's findings and that the Petitioner entered knowing, intelligent, and voluntary guilty pleas. He is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, the judgment of the post-conviction court is affirmed.

_____
ROBERT H. MONTGOMERY, JR., JUDGE